UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

and *ex rel.* CARLA CROCKETT,

      Plaintiff/Relator,

v.

COMPLETE FITNESS REHABILITATION, INC.,

      Defendant.

_____/

Case No. 13-12362

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS RELATOR'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) [21]**

This matter is before the Court on Defendant Complete Fitness Rehabilitation, Inc.'s ("Defendant" or "Complete Fitness") motion to dismiss Plaintiff/Relator Carla Crockett's ("Plaintiff" or "Relator") First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Docket 21.) Plaintiff filed a response (dkt. 24), Defendant filed a reply (dkt. 25). Plaintiff originally brought this action as a *qui tam* relator on behalf of the United States. (Dkt. 1.) The United States declined to intervene. (Dkt. 11.)

**I.   FACTS**

Plaintiff is a certified occupational therapist who was hired by Defendant on March 5, 2012, as an Occupational Therapist/Rehab Manager. (Am. Compl. ¶¶ 11, 12, dkt. 20.) Plaintiff was hired to work at a skilled nursing facility ("SNF") in Petoskey, Michigan,

managed by Bortz Health Care Facilities ("Bortz", a non-party to this action; health care facility referred to hereinafter as "Bortz"). (Am. Comp. ¶¶ 3, 15.) This action arises out of Plaintiff's termination by Defendant on September 28, 2012, and Plaintiff's allegations that Defendant engaged in multiple schemes in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a) or (b) to maximize medicare revenue. (Am. Compl. ¶ 13.)

Plaintiff's responsibilities for Defendant at Bortz included distributing patient caseloads among the other therapists, reviewing their schedules, communicating with Defendant's corporate offices and maintaining her own case loads of patients. (Am. Compl. ¶ 24.) Plaintiff defines her duties as an occupational therapist as "working in an interdisciplinary team to diagnose newly admitted patients and determine the medically appropriate level of therapy per patient." (Am. Compl. ¶ 26.) Plaintiff's job description, an exhibit to the Amended Complaint, includes the following responsibilities: "Reviews Physician's referral (prescription) and patient's condition and medical records to determine occupational therapy treatment required", "[p]lans and prepares written treatment program based on evaluation of patient data," "[e]valuates effects of treatment at various stages and adjusts treatments to achieve maximum benefit," "[c]onfers with Physician and other practitioners to obtain additional patient information, suggest revisions in treatment program, and integrate physical therapy treatment with other aspects of patient's health care," "[c]ompletes all billing logs per policy," and "[s]elects constructive activities suited to individual's physical capacity, intelligence level, and interest to upgrade individual to maximum independence, prepare individual for return to employment, assist in restoration of functions, and aid in adjustment to disability." (Am. Compl. ¶ 26; Job Descript., Am. Compl. Ex. E, dkt. 20-6.)

2

Despite Plaintiff's job description giving her some responsibility to determine the occupational therapy requirements and make adjustments thereto, at the heart of Plaintiff's fraud allegations are that Defendant engaged in "upcoding" by instructing Plaintiff to schedule and treat all patients at an "ultra high" level of rehabilitation.[1] (Am. Compl. ¶¶ 85, 111.)

Plaintiff describes the billing reimbursement system at SNF facilities such as Bortz for Medicare Part A patients as being per diem at rates set by a formula. (Am. Compl. 69.) The formula includes the following classification: "Patients receiving rehabilitative care can be classified into one of fourteen different Resource Utilization Groups ("RUG"), based on the number of therapy minutes they receive each week. These RUG groups are broadly categorized as "low", "medium", "high", "very high", and "ultra high" rehabilitation." (Am. Compl. ¶ 70) Plaintiff alleges that the minimum number of minutes required for ultra high ("UH") is 720 minutes of therapy per week, with the patient requiring at least five days of therapy per week, at a minimum total of 720 minutes per Medicare review cycle. (Am. Compl. ¶¶ 72, 73.) The minimum number of minutes for "very high" ("VH") is 500. (Am. Compl. ¶ 72.) Plaintiff further alleges that an Activities of Daily Living ("ADL") index score that measures the functional limitations of each patient is summed with the number of therapy minutes to determine the patient's specific RUG. (Am. Compl. ¶ 74.) Each RUG has a different per diem payout, and Plaintiff alleges that the estimated pecuniary difference from one RUG level to the next is approximately $110 to $150. (Am. Compl. ¶¶

---

[1] "Upcoding" is "the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided." *United States ex rel. Bledsoe v. Community Health Sys.*, 342 F.3d 634, 637 n.3 (6th Cir. 2003) (*Bledsoe I*); (Am. Compl. ¶ 85).

75, 76.)

Plaintiff alleges that Medicare Part A patients at Defendant Complete Rehab are coded upon admittance and that the RUG level assigned to patients on Day 1 remained the same by Day 28, at the ultra high level, so that Medicare was billed the maximum rate for the entire average length of stay of 28 days. (Am. Compl. ¶¶ 77, 79.) Medicare Part B is billed for each service rendered for the patient and those services are tracked by procedure codes and logged by therapists at the time of the service.[2] (Am. Compl. 80.)

Plaintiff provides multiple emails that show that her direct supervisor at Complete Rehab, Pam Ulrey, the Regional Rehab Manager, encouraged, directed and/or demanded that Medicare Part A patients be treated at the ultra high level of therapy, or that Medicare Part B patients be given additional minutes of therapy, and the emails show that some of these requests and/or requirements were related to revenue. (Am. Compl. ¶¶ 89, 111, 112, 122, 143, 150.)

Ulrey worked out of Bortz's Traverse City, Michigan location. (Am. Compl. ¶ 89.) According to Plaintiff, Ulrey's responsibilities include training, approval of overtime requests, scheduling, day-to-day supervision and check-ins, remote access to the Petoskey site schedules (Plaintiff's location) and therapy plans, and termination of employees. (Am. Compl. ¶¶ 90, 100.) Plaintiff was required to have schedules approved by Ulrey, and was

---

[2] Plaintiff alleges that either Defendant submitted Medicare claims directly to Medicare, or a third party (Bortz) relied on Defendant's billing to submit claims to Medicare. (Am. Compl. ¶ 64.) In its brief, Defendant agrees that it is Bortz who ultimately submits claims for payments to Medicare. "In sum, Complete Rehab bills Bortz directly for services rendered to residents covered under Part A or Part B of Medicare, at the rates established by the negotiated contract between Complete Rehab and Bortz. . . . . Bortz, in turn, submits claims for payments to Medicare, and Medicare (sic)." (Def.'s Br. 8 n.15.)

4

given daily feedback by Ulrey, especially regarding productivity. (Am. Compl. ¶¶ 96, 97.) Plaintiff and other employees were given productivity targets, which equal 1:1 billable time between therapist and patient. (Am. Compl. ¶¶ 24-25.) Plaintiff's target was 70% productivity. (Am. Compl. ¶¶ 24-25.) Plaintiff was required to submit to Ulrey the billing codes or RUG levels for every patient at the end of every day. (Am. Compl. ¶ 121.) Ulrey would respond remotely to either approve the coding or pressure Plaintiff to upcode. (Am. Compl. ¶ 122.)

Plaintiff in her Complaint alleges that Defendant created six fraudulent schemes. The first she identifies as "unnecessary and unreasonable upcoding of Medicare Part A patients' RUGs on admittance." (Am. Compl. Heading at ¶¶ 105-106.) As an example, Plaintiff alleges that McLaren Northern Michigan Hospital was a referral source and in at least one case between April 16 and September 28, 2012, the hospital referred a patient to Petoskey Bortz for "sub acute rehab."[3] (Am. Compl. ¶ 110.) Plaintiff alleges that despite this sub acute medical assessment, in compliance with Defendant's admittance procedures, patients were coded at ultra high or very high. (Am. Compl. ¶ 110.) Plaintiff alleges that she was advised to code all incoming patients at the ultra high level, regardless of the doctor's referral note or her own medical assessment, or the assessment of the interdisciplinary team who reviewed the doctor referral and met the patient. (Am. Compl. ¶ 111.)

In an April 20, 2012 email, Ulrey informed Plaintiff:

---

[3]Plaintiff explains a distinction between acute rehabilitation and sub-acute rehabilitation, with acute rehabilitation being the more intensive of the two. Plaintiff cites an *Association of Rehab Nurses* article which suggests that a sub acute patient should be provided with therapy three to five days per week at less than three hours per day. (Am. Compl. ¶ 109, Ex. U.)

> If you are planning on upping RUG levels to justify bringing in prn staff then you should try to maximize level on admission i.e [patient L] 35 minutes/high level?? [a]dmit then trying to ramp up later. It looks to me like you only have 2 UHs (and that is because of SLP) and 5 VHs.

(Am. Compl. ¶ 112, Ex. V, dkt. 20-23.) The other five schemes alleged by Plaintiff include the following: Unnecessary and unreasonable upcoding after admittance for Medicare A patients; Defendant stopped or delayed therapy, despite medical necessity, if therapy would not increase reimbursements; unnecessarily and unreasonably requiring increased length of therapy to maximize Medicare Part B funds; unnecessarily and unreasonably increasing length of therapy to maximize Medicare Part B funds; and encouraging falsification of time records and billing for services that were not provided. (Am. Compl. ¶¶ 120-170.)

On July 29, 2012, Plaintiff stepped down from her position as Rehab Manager to Occupational Therapist only. (Am. Compl. ¶ 104.) By stepping down as Rehab Manager, Plaintiff gave up a $75,000 salary to receive less money at an hourly wage. (Am. Compl. ¶ 36.)

On September 11, 2012, Plaintiff's co-worker, Janet Rikers, sent an email to Ulrey, notifying that two newly admitted patients need to be at the very high level of therapy, citing issues such as shortness of breath, dementia and dialysis. (Riker Email, Sept. 11, 2012, Am. Compl. ¶¶ 39, 116, Ex. H, dkt. 20-9.) Ulrey responded to both Riker and Plaintiff, stating:

> OK BUT you guys need to get out of the mindset of no one ever being UH unless seen by speech as well as OT/PT. These two pts have only been in your building one day yet you are already certain of their tolerance???? The dxs you stated do not necessarily indicate lower tolerance. I expect you to give the higher level a better attempt before giving up. This is clearly a pattern in Petoskey and it has not gone unnoticed.

(Ulrey Email Sept. 11, 2012, Am. Compl. ¶ 117, Ex. H, *Id.*) Further examples and emails on which Plaintiff relies in her Amended Complaint are set forth in the analysis below.

On September 18, 2012, Ulrey sent the following email to Riker and Plaintiff:

RE: Petoskey RUG levels.

I will be adjusting the planner to reflect ultra high levels on all Med A's currently on caseload.

We have been contacted by corporate Bortz regarding the low RUG levels at the Petoskey facility. The lowest out of all the Bortz facilities. I do not believe that Petoskey patients are any less appropriate for UH levels then (sic) any other facility. This is no longer negotiable. You need to be creative. Because of your history of being unsuccessful in getting UH level for almost all of your patients (without the help of SLP) I am going to be much less likely to accept reasons for lower levels. You simply need to try harder.

(Am. Compl. ¶ 40, Ex. I, dkt. 20-10.)

On September 19, 2012, Plaintiff sent the following email to Ulrey and Riker:

I would like to extend my deepest condolences to Pam, while she is on leave dealing with family matters. I have lost a parent and have been thinking of you during this difficult time.

Thank you Pam for taking time to speak with me directly about this topic this morning.

At the Petoskey site, our team collectively makes professional determinations to establish clinically appropriate RUG levels. As licensed clinicians, it is our obligation to make autonomous skilled judgments that reflect the patients' best interest. Setting all patients at the ultra high level, regardless of medical status, is not appropriate. This is not in alignment with national averages regarding RUG levels. Professional standards require acting with nonmaleficence and veracity.

It is my understanding that the Petoskey site has long struggled to be profitable for Complete Rehab. This is a systemic problem that has lasted through many employees and likely reflects many complex issues. While it may be expeditious to blame us for not trying hard enough, it is a simplification that will not hold up to scrutiny. I would be happy to have an administrator shadow me, to see exactly how hard I work on a daily basis.

7

It is in our best interest to increase revenue. I am happy to explore a variety of possibilities with this goal in mind. However, we seem to be at an impasse. I will not suspend my clinic responsibilities to our patients. I cannot comply with your request to have all Med A's in Ultra High, but I will work with veracity to work hard to be creative for this goal.

(Am. Compl. ¶ 41, Ex. J, dkt. 20-11.) Plaintiff alleges that following this email she was cut-off from Defendant and Ulrey: Plaintiff received no more emails, text messages, phone calls or other communications, despite having previously been "in nearly continuous contact with them." (Am. Compl. ¶ 42.) On September 28, 2012, Plaintiff received an email reminding her that a previously scheduled meeting would still take place that day. (Am. Compl. ¶ 43, Ex. K, dkt. 20-12.) Ulrey fired her that day, notifying that Defendant had "already found someone to start on Monday" and that she did "not need to show back up here." (Am. Compl. ¶¶ 44, 105.)

Plaintiff filed a *qui tam* complaint on May 29, 2013. The government declined to intervene and the complaint was unsealed on February 22, 2016. Plaintiff filed the Amended Complaint on June 9, 2016. (Dkt. 20.)

## II. LEGAL STANDARD

Defendant brings this motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), alleging the "failure to state a claim upon which relief can be granted" and alleging that Plaintiff's Amended Complaint fails to meet the heightened pleading standard of Fed. R. Civ. P. 9. *See* Fed. R. Civ. P. 12(b)(6) and 9. The Sixth Circuit noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n,* 714 F.3d

8

920, 924-25 (6th Cir. 2013) (internal quotations and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotations and citations omitted). Furthermore, while the "plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Estate of Barney*, 714 F.3d at 924 (citing *Iqbal*, 556 U.S. at at 679; quoting Fed. R. Civ. P. 8(a)(2)).  If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.  Finally, the Court must keep in mind that "on a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555 (citation omitted).

> Complaints alleging FCA violations must comply with Rule 9(b)' s requirement that fraud be pled with particularity because "defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts." Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Rule's purpose is to alert defendants "as to the particulars of their alleged misconduct" so that they may respond. The heightened pleading standard is also designed to prevent "fishing expeditions," to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters.

*Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466-67 (6th Cir. 2011) (internal citations omitted). Yet Fed. R. Civ. P. 9(b) is to be read in conjunction with Fed. R. Civ. P. 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."

9

Fed. R. Civ. P. 8; *see also U.S. ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007) (*Bledsoe II*) ("When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." ).

"[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed.R.Civ.P. 10(c)). "In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Id.* at 335-36; *see also Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir.1999). Plaintiff provided a plethora of documents with her Complaint. The documents provided with the Amended Complaint are primarily emails in direct support of and referenced within the allegations of the complaint; the Court's consideration of and reference to them for the limited purposes of Defendant's motion to dismiss do not convert this motion to one for summary judgment.[4]

## III.  ANALYSIS

### A.  Whether Plaintiff Pleads Count I, Violation of the False Claims Act, With The Requisite Particularity

---

[4]With her response, Plaintiff submitted a spreadsheet entitled "Spreadsheet of Specific Incidents" which is a summary of specific incidents, by date, exhibit, complaint paragraph and an indication of whether the incident applies to Medicare Part A or Medicare Part B patients. (Pl.'s Resp. Ex. 1, dkt. 24-2.) Defendant argues that this is an improper exhibit with respect to a motion to dismiss. The information is gleaned from the Amended Complaint itself  and its exhibits, and the Court considers it only as it would similar summaries of the complaint's allegations, were they contained within a brief. Further, Defendant correctly points out that the spreadsheet does not identify any false claims for payment.

In Count I, Plaintiff alleges that Defendant violated the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a) or (b)[5], by either directly submitting or causing a third party to submit false claims to Medicare for reimbursement. (Am. Compl.) The FCA provides liability for "[a]ny person who ... knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B) (2016). "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).   A "claim" "means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (I) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, . . . ." 31 U.S.C. § 3729(b)(2)(A). In complying with Rule 9(b) and pleading an FCA violation, the plaintiff must allege (1) "the time, place, and content of the alleged misrepresentation," (2) "the fraudulent scheme," (3) the defendant's fraudulent intent, and (4) "the injury resulting from the fraud." *Bledsoe II*, 501 F.3d at 504 (citation omitted). "Courts have held that [Rule 9(b)] may be relaxed where information is only within the opposing party's knowledge." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988).

Defendant argues that Plaintiff's claim cannot survive because Plaintiff must identify

---

[5]Plaintiff appears to refer to 31 U.S.C. § 3729(a)(1)(B); 31 U.S.C. § 3729(b) is definitions.

specific false claims and cannot merely allege the existence of a fraudulent scheme. (Def.'s Br. 11, dkt. 21.) Defendant argues that liability attaches "not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Sanderson v. HCA – The Healthcare Company*, 447 F.3d 873, 877-78 (6th Cir. 2006) (citation omitted). In *Sanderson*, the Sixth Circuit recognized that it had "only the allegation that to the plaintiff's 'information and belief,' fraudulent claims have been made based on HCA's allegedly illegal accounting methodology." *Id.* at 878. The *Sanderson* court held that the allegations in the complaint before it were "limited to speculation and unsupported conclusion," noting that the plaintiff did not support his assertion that the accounting methodology was prohibited, and asserted "that unidentified persons made claims for reimbursement based on the accounts on unspecified occasions and, as a result, that all such claims violate the Act." *Id.* at 878.

Plaintiff responds that the cases on which Defendant relies pre-date the 2009 Fraud Enforcement and Recovery Act ("FERA") amendments to the FCA, which removed the requirement that the alleged false claims actually be presented to the government for payment. (Pl.'s Resp. 12, dkt. 24.) Plaintiff also argues that Congress removed the requirement that a subcontractor act with the specific intent to get a false claim paid "by the government." *See generally United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 638 (7th Cir. 2016)(the FCA contains no presentment requirement. . . . FCA liability attaches to any false claim to any entity– public or private– implementing a government program or a program using government funds.").[6] Yet despite FERA's 2009 clarification of the FCA

---

[6] The Court agrees with Plaintiff that under the FCA, 31 U.S.C. § 3729, it does not matter whether it was Bortz or Defendant who ultimately submitted the claim to the

and broadening its application, recent cases in this circuit continue to note "[a] clear and unequivocal requirement that a relator allege specific false claims when pleading a violation of the FCA." *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 411 (6th Cir. 2016) ("This requirement derives from the fact that 'the [FCA] statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'")(citations omitted); *see also U.S. ex rel. Winkler v. BAE Systems, Inc.*, 957 F. Supp. 2d 856, 865, 873 (E.D. Mich. 2013) ("Because the 'false claim' itself is a requirement of the cause of action, it is not sufficient that the complaint allege the underlying fraudulent conduct with particularity – the complaint must also allege the presentment of a false claim for payment to the government with the same particularity." "While the Sixth Circuit has embraced the implied false certification theory and the strong inference exception, it has likewise never backed away from the bedrock principle that an actual false claim presented to the Government is the *sine qua non* of a claim under the FCA.").

Plaintiff argues in favor of the "relaxed standard" contemplated in *Chesbrough v. VPA*:

*Bledsoe* left open the possibility that a court may "relax" the requirements of Rule 9(b) "in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator." We decline to speculate "as to the contours or existence of any such exception to the general rule that an allegation of an actual false claim is a necessary element of a FCA violation."

*Chesbrough*, 655 F.3d at 470-71 (citing *Bledsoe II*, 501 F.3d at 504 n. 12). Plaintiff relies on the extensive pleadings and attachments to her Amended Complaint to argue that she

---

government; 31 U.S.C. § 3729 imposes liability for submitting or causing another to submit a false claim.

has more than sufficiently stated a claim, alleging that she "has provided numerous examples of these fraudulently coded patients" that were the "very foundation of what was billed to the government for revenue." (Pl.'s Resp. 12.)

Of Plaintiff's six alleged fraudulent schemes in violation of the FCA, numbers 1 and 2 involve allegations of upcoding Medicare A patients' RUGs on admittance and after admittance. (Am. Compl. ¶¶ 106-135.) Alleged fraudulent schemes 4 and 5 involve unnecessarily and unreasonably requiring increased length of therapy and increasing length of therapy to maximize Medicare Part B funds. (Am. Compl. ¶¶ 142-159.) Plaintiff's Amended Complaint references emails between her and her supervisor, Ulrey, that show that Ulrey applied pressure to Plaintiff to maintain productivity targets, to attempt higher levels of therapy, and to provide the maximum minutes of therapy to maintain those levels–some of those emails are cited above. The email which Plaintiff identifies as the "smoking gun" in these schemes is the September 18, 2012 email from Ulrey to Riker and Plaintiff, in which Ulrey announced that she "will be adjusting the planner to reflect ultra high levels on all Med A's currently on caseload," further stating that "[t]his is no longer negotiable. You need to be creative. Because of your history of being unsuccessful in getting UH level for almost all of your patients (without the help of SLP) I am going to be much less likely to accept reasons for lower levels. You simply need to try harder." (Am. Compl. ¶ 40, Ex. I, dkt. 20-10.)

The claims for the fraudulent schemes identified as numbers 3 and 6 vary slightly in that they do not directly involve upcoding. Scheme number 3 is an allegation that Defendant stopped or delayed therapy, despite medical necessity, if therapy would not increase reimbursements. (Am. Compl. ¶¶ 136-41.) Plaintiff alleges the following:

14

138. Compliance with Medicare Part A is assessed on certain dates, Assessment Reference Dates ("ARD"). Service providers must provide the minimum number of minutes and sessions indicated by their RUG goal within the window of time from one ARD to the next.

139. Because it aimed to maximize profit, Complete Rehab did not provide the medically reasonable and necessary amount of care for patients who had already met their quota before an ARD.

140. Instead, Complete Rehab instructed its employees to cut back medically necessary and reasonable services if the minimum number of minutes had been met for the target RUG code. In at least one instance from April 24, 2012 to September 28, 2012, Ms. Crockett was instructed to move schedules around so that patients did not receive therapy beyond the minimum needed to meet the ARD.

141. Further, because of its attempt to maximize reimbursement, Complete Rehab had a policy of sending patients home after an ARD, and admitting new patients at the start of an ARD window.

(Am. Compl., dkt. 20.)

Plaintiff's alleged scheme number 6 is captioned "Unworked Hours and Falsified Time

Records":

160. Complete Rehab encouraged falsification of time records. Upon information and belief, Complete Rehab billed or led a third party to bill for services that were never provided.

161. For example, throughout her employment, Complete Rehab requested that Ms. Crockett and other Complete Rehab employees log their lunch hour as billable hours.

162. On May 22, 2012, Ms. Crockett noted her concern to Ms. Ulrey over the manner in which lunch hours were logged: "Could you please help me understand because it is unclear how to have a lunch that is granted 60 minutes for key staff and 30 minutes for PRN **while having that time be included in the hours worked and have an accurate productivity** amount in the reports. That does not make sense to me because **if someone is on lunch they cannot also be doing directly billable services."** [Ex. CC, Thursday On-Site Visit Email, at 1, May 22, 2012 (emphasis added)] As discussed *supra*, productivity refers to 1:1 billable time between a therapist and a patient.

163. On numerous occasions, Ms. Crockett's schedule reflected planned sessions that would have been impossible to achieve in working hours. [citation omitted]

164. For example, on September 4, 2012, Ms. Ulrey wrote to Ms. Crockett and copied Janet Riker:

15

> **I approve overtime for today** for both of you but in looking at the schedule and planner I notice that you have made changes – **all Med B's reduced to 15 minutes?? Please remember that only one person (me) should be making changes.** I know you felt it was necessary **in order to make your day more manageable** but please remember that you are not to make changes. [Am. Compl. Ex. T, (emphasis added in Am. Compl.)]

165.   In other words, Ms. Crockett was not allowed to change the schedule to reflect her actual hours worked.

. . .

169.   Upon information and belief, Complete Rehab never adjusted the times logged to reflect actual time spent.

(Am. Compl.)

Plaintiff argues that she has plead sufficient examples of fraudulent conduct, and that she has provided sufficient "representative samples" of a broad class of claims. Yet Plaintiff admits in her Amended Complaint that "[a]s an Occupational Therapist/Rehab Manager, Ms. Crockett never had access to Complete Rehab's billing or to the specific claims submitted to the government for reimbursement." (Am. Compl. ¶ 54.) Plaintiff alleges that

61.   Complete Rehab therapists were required to enter their own billable units by logging the amount of time spent on a patient.

62.   Complete Rehab remotely accessed therapist schedules to determine whether therapists were billing sufficient minutes.

63.   As discussed *infra* "Medicare Reimbursement", part of the reimbursement from Medicare relies on the number of minutes worked.

64.   Upon information and belief, either Complete Rehab submitted Medicare claims directly to Medicare, or a third party (e.g. Bortz) relied on Complete Rehab's billing to submit claims to Medicare.

65.   These claims made use of the minutes billed by therapists.

66.   The number of minutes to work per patient were set by Complete Rehab.

(Am. Compl.) Plaintiff alleges in her Amended Complaint that she has "never had access to the specific bills submitted by Complete Rehab" and further states that "given the intense pressure on [Plaintiff] to log hours worked, increase productivity on Medicare Part A and

16

Medicare Part B patients, send out weekly reports on the hours worked on these patients, and the daily review by Ms. Ulrey of the minutes worked on these patients, [Plaintiff] believes that Complete Rehab either directly submitted or caused a third party to submit false claims to Medicare for reimbursement, and there is every reason to believe this practice continued without her resistance after she was terminated." (Am. Compl. ¶ 175.)

Yet absent from Plaintiff's allegations is any specific identification of a false claim– she draws conclusions based upon "information and belief." Neither scheme number 3 nor 6 contains information from which the Court may do more than speculate that the complained of activities resulted in a fraudulent claim. There is no specific allegation that the lunch periods were ultimately fraudulently billed (or submitted to Bortz) as therapy time. This is illustrative of the deficit in each of the schemes which Plaintiff alleges, including upcoding schemes 1, 2, 4 and 5. While the Court may be able to agree that Ulrey's supervisory methods and her approach to scheduling therapy were aggressive, Plaintiff fails to plead her fraud claim with specificity: She fails to identify a fraudulent claim. This is fatal to her complaint. The facts are not unlike *Bledsoe II*, wherein the Sixth Circuit disagreed with the relator's argument that it was unnecessary that he identify specific false claims, and it was adequate to plead a false scheme with particularity. See *Bledsoe II*, 501 F.3d at 504. The *Bledsoe II* court held that "pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)." *Id.* As Defendant correctly points out, Plaintiff's allegations lack any specifics about the time, place and contents of an allegedly false claim.[7] *See Bledsoe II*, 501 F.3d at 505

---

[7] It is worth noting that Plaintiff has failed to plead any claims with specificity, and therefore may not also proceed to discovery on a fraudulent scheme, which still requires

17

(citing *Bledsoe I*, 342 F.3d at 643). Even where Plaintiff alleges that a sub acute patient was placed at a high level for therapy, her allegations quickly become general, concluding that "[d]espite this medical assessment, in compliance with Complete Rehab's admittance procedures, patients were coded at ultra high or very high." (Am. Compl. ¶ 110.) The Court is left to speculate, what happened next? Did the sub acute patient perform the UH or VH levels of therapy? Was it an inappropriate level and by what determination? If it were inappropriate, was the patient then treated at a different level of intensity and frequency? And finally, what has ultimately submitted to Bortz or billed? The allegations do not connect the alleged fraud to a specific claim.[8]

Defendant also argues that Plaintiff fails to allege the "materiality" element of an FCA claim. The Court need not reach this argument, where Plaintiff has failed to identify a specific false claim. For the reasons set forth above, the Court grants Defendant's motion as to Count 1.

### B. Whether Plaintiff's Reverse False Claims Act Count Alleges Receipt of Government Payment That Defendant Was Obligated To Repay

Count Two is a reverse false claim under 31 U.S.C. § 3729(a)(1)(G). This claim arises

---

specificity in those claims that are plead as examples or illustrative of a class of claims covered by the fraudulent scheme. *Bledsoe II*, 501 F.3d at 510-511.

[8] This is the same failure with Plaintiff's allegations that it was "medically inappropriate" to try to deliver an ultra high level of therapy to a patient with Guillain-Barre Syndrome. (Am. Compl. ¶¶ 129-134.) As another example, Plaintiff alleges in paragraph 163 of the Amended Complaint that "[o]n numerous occasions, [her] schedule reflected planned sessions that would have been impossible to achieve in working hours." The allegation is not that these "planned" hours were subsequently billed, but not worked. Plaintiff then alleges that she "was not allowed to change the schedule to reflect her actual hours worked" yet she identifies no "planned" session that was unworked and resulted in a claim as if it had been worked in full. (Am. Compl. ¶¶ 164-165.)

18

where a person

> [K]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, . . . ."

31 U.S.C. § 3729(a)(1)(G). Plaintiff's allegation under this count is that Defendant failed to return or remit back to the Federal Government the Medicare overpayments Defendant received. (Am. Compl. ¶¶ 177-82, 180.) The Sixth Circuit in *Chesbrough* found that the plaintiffs' reverse false claim allegations failed where they did not identify a concrete obligation owed to the government by the defendant "at the time an allegedly false statement was made" and "they merely allege [the defendant] is obligated to repay all payments it received from the government." *Chesbrough*, 655 F.3d at 473. Plaintiff's allegations here are similar. The Court agrees with Defendant that Plaintiff fails to allege that Defendant owed any concrete obligation to the government at the time an allegedly false statement was made. *See generally Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 734 (6th Cir. 1999) ("[A] plaintiff may not state a reverse false claim unless the pertinent obligation attached *before* the defendant made or used the false record or statement."). The Court grants Defendant's motion to dismiss as to Count II.

### C. Whether Plaintiff Stated A Claim For Conspiracy

In Count III, Plaintiff alleges a conspiracy to violate the FCA, 31 U.S.C. § 3729(A)(1)(c), which provides liability for conspiring to commit a violation of subparagraphs (A), (B), (D), (E), (F) or (G). *See* 31 U.S.C. § 3729(a)(1)(A)-(G). Plaintiff must plead with particularity that Defendant and Bortz conspired to defraud the government of Medicare funds. *See U.S. ex rel. Kreipke v. Wayne State Univ.*, 2014 WL 6085704 (E.D. Mich. Nov.

19

13, 2014.) "To establish conspiracy under the FCA, a plaintiff must show that '(1) there was a single plan to get a false claim paid, (2) the alleged coconspirators shared in the general conspiratorial objective to get a false claim paid, and (3) one or more conspirators performed an overt act in furtherance of the conspiracy to get a false claim paid.'" *Id.* at *4 (quoting *U.S. ex rel. Howard v. Lockheed Martin Corp.*, 499 F.Supp.2d 972, 980 (S.D. Ohio 2007)); *see also United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (applying conspiracy criteria from the civil context to the FCA).

The Court agrees with Defendant that Plaintiff's conspiracy claim should be dismissed where the Amended Complaint does not state the underlying false claim with sufficient specificity under Fed. R. Civ. P. 9. The "failure to sufficiently plead a violation of § 3729(a)(1)(A) or (B) necessitates a finding of a failure to plead a conspiracy to violate those sections under § 3729(a)(1)(C)." *Winkler*, 957 F.Supp.2d at 876. The Court will grant Defendant's motion to dismiss Plaintiff's Count III.

### D. Whether Plaintiff Stated A Claim For Retaliatory Discharge

Count IV is a claim for retaliatory discharge. "In order to establish a claim for retaliatory discharge, a plaintiff must show: (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) (citing *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 513–514 (6th Cir. 2000) (McKenzie II )). Defendant argues that this claim should be dismissed because the Amended Complaint fails to allege that Plaintiff engaged in a protected activity. FCA, 31 U.S.C. § 3730(h), provides that:

20

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). This version of the FCA was amended in 2009 and "now 'protects two categories of conduct.' " *Tibor v. Michigan Orthopaedic Inst.*, No. 14–10920, 2014 WL 6871320, at *2 (E.D.Mich. Dec.5, 2014) (Cox, J.) (quoting *Halasa v. ITT Educ. Svs., Inc.*, 690 F.3d 844, 847 (7th Cir.2012)). In addition to protecting lawful acts taken in furtherance of an action under the FCA, it now also protects "employees from being fired for undertaking 'other efforts to stop' violations of the Act, such as reporting suspected misconduct to internal supervisors." *Halasa*, 690 F.3d at 847–48.

An internal report to a supervisor is an "effort" covered by the FCA. *See Mikhaeil v. Walgreens Inc.,* 2015 WL 778179 (E.D. Mich. Feb. 24, 2015). To be protected, however, the internal report must "specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct." *Guerrero v. Total Renal Care, Inc.*, No. 11–449, 2012 WL 899228, at *5 (W.D.Tex. Mar. 12, 2012); *see also U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C.Cir. 1998) ( "[A] plaintiff still must show that his employer was aware of his protected activity. Merely grumbling to the employer about job dissatisfaction or regulatory violations does not ... constitute protected activity .... Threatening to file a qui tam suit or to make a report to the government, on the other hand, clearly is one way to make an employer aware. But it is not the only way.") (interpreting the pre-amendment FCA); *see also McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 513-14 (6th Cir. 2000) (*McKenzie II*) (citing *Yesudian*).

21

To determine whether Plaintiff has adequately plead a claim for retaliatory discharge, the Court looks to similar cases for guidance. In *Guerrero v. Total Renal Care*, the court found it sufficient where the Plaintiff plead "that he reported to a supervisor that 'a Registered Nurse ... working for Defendant was committing Medicare/Medicaid *fraud* by charging for procedures that were not done and charging for procedures which had not been ordered by a medical doctor.'" *Guerrero*, 2012 WL 899228, at *6. The court further noted the plaintiff alleged that he made this report to a clinical coordinator and "indicated that he planned to make additional internal reports about the fraud to [the nurse in question's] supervisors." *Id.* at *6. The court found that "[b]ecause [the plaintiff] specifically alleges that he reported the fraudulent claims for federal funds, [his] allegation is sufficient to state a claim for a protected activity." *Id.* at *6.

In *U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935 (6th Cir. 1997) (*McKenzie I*) (*superceded by statute*), the Sixth Circuit found that the district court improperly dismissed Plaintiff's retaliation claim. The Sixth Circuit found the following interpretation of § 3730(h) to be correct: "[A]n employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a qui tam action against it." *Id.* at 944 (quoting *Mikes v. Strauss*, 889 F. Supp. 746, 753 (S.D.N.Y. 1995)). In *McKenzie*, the relator had begun complaining to her supervisors about the practices at issue in 1984 and continued to complain until she left on disability status in 1992. *See id.* at "On one occasion McKenzie showed her supervisor a newspaper article describing a similar fraud being perpetrated in Florida. [The plaintiff] claim[ed] that as a result of her complaints, she was harassed and threatened with discharge." *Id.* at 936. The

22

Sixth Circuit concluded "that the activity engaged in by McKenzie, including bringing the alleged fraud to the attention of her supervisors and showing them a newspaper article describing a qui tam action in Florida involving similar allegations of fraud, are protected activities within the meaning of the Act." *Id.* at 944; *see also United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439 (6th Cir. 2008) (reversing district court dismissal of § 3130(h) claim where the plaintiff alleged that she "observed purportedly fraudulent activity and confronted her employer about it," she told employer that she believed the employer " was receiving 'illegal' 'large incentive payments' under its contract with DOE because [employer] was 'underreporting [its employees'] work-related injuries and illnesses.'" "She therefore connected her complaint of [employer's] actions, under-reporting, to a concern about fraud on the federal government."). The *McKenzie* cases show that the Sixth Circuit recognized that internal reports of fraud can qualify as protected activity, which was later made clear in the 2009 FERA amendments providing protection not only for lawful acts "in furtherance of an action under this section," but for "other efforts to stop 1 or more violations of this subchapter." *See* 31 U.S.C. § 3730(h)(1); *see also Mikhaeil*, 2015 WL 778179, at *7, 8 (noting in motion for summary judgment that the plaintiff's reports of "potential violations of Schedule II substance regulations" did not "constitute protected activity because none of these violations allege fraud on the government" and fell "into the category of unprotected 'grumbling'" about regulatory violations; yet the plaintiff's testimony that she told the pharmacy supervisor that she was concerned about a potential instance of Medicare fraud and that she told the supervisor the relevant prescription numbers with which she was concerned was protected activity under the FCA).

In both the Amended Complaint and her response, Plaintiff relies on her September

19, 2012 email to Ulrey to show protected activity, calling it a "protest in writing." (Pl.'s Resp. 20; Am. Compl. ¶ 201.) Plaintiff's September 19 email, however, makes no reference to Medicare (other than identifying patients as "Med As", upcoding or otherwise alleges fraud on the government. Even the broadest reading of the email elicits nothing more telling than an almost cryptic reference to "veracity" and the following statement, alleged in Plaintiff's retaliation claim at ¶ 201 of the Amended Complaint: "As licensed clinicians, it is our obligation to make autonomous skilled judgments that reflect the patients' best interest. Setting all patients at the ultra high level, regardless of medical status, is not appropriate. This is not in alignment with national averages regarding RUG levels." (Am. Compl. ¶ 201.) Plaintiff alleges that this was a specific reference to upcoding.

The remainder of Plaintiff's email reads as follows:

Professional standards require acting with nonmaleficence and veracity.

It is my understanding that the Petoskey site has long struggled to be profitable for Complete Rehab. This is a systemic problem that has lasted through many employees and likely reflects many complex issues. While it may be expeditious to blame us for not trying hard enough, it is a simplification that will not hold up to scrutiny. I would be happy to have an administrator shadow me, to see exactly how hard I work on a daily basis.

It is in our best interest to increase revenue. I am happy to explore a variety of possibilities with this goal in mind. However, we seem to be at an impasse. I will not suspend my clinic responsibilities to our patients. I cannot comply with your request to have all Med A's in Ultra High, but I will work with veracity to work hard to be creative for this goal.

(Am. Comp. Ex. J, dkt. 20-11.)

To the extent Plaintiff also alleges that the "pressure to upcode led [her] to step down from her position as Rehab Manager, effective September 2, 2012," the email in which she advised Ulrey of same is similarly innocuous, making no mention of fraud, Medicare or

24

upcoding. She wrote to Ulrey:

> Dear Pam and Maryjo, I would like to officially step down from the position of Rehab Manager as of September 1st. I have given my reasons in previous correspondence. In addition, I would also like to be switched from salary to hourly compensation. I believe that these changes will allow me to have a productive and lengthy career with Complete Rehab.

(Am. Compl. ¶ 35; Step-Down Email, July 29, 2012, Am. Compl. Ex. G, dkt. 20-8.)

The allegations in Plaintiff's Amended Complaint do not show a connection between her correspondence with Ulrey regarding the appropriateness of patients' RUG levels and minutes of therapy, and exposing fraud. While the Court takes the appropriate "broad view of protected activity," and does not impose a requirement for the use of formal words as "illegal" or "fraud", Plaintiff's complaint contains no allegation of a report to a supervisor or other action that alleges fraud and does not rise above correspondence of the nature of "merely grumbling," general concerns, or disputes over appropriate levels of treatment in the context of "professional standards." *See McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 516 (6th Cir. 2000)(*McKenzie II*) (superceded by statute)("McKenzie need not use formal words of 'illegality' or 'fraud' . . . .). Plaintiff's has not made allegations to show that she was engaged in a protected activity.

As to the remaining elements necessary to a retaliation claim, Plaintiff argues that knowledge is imputed where the email was sent to Ulrey and Ulrey's supervisor. Plaintiff alleges that immediately after sending the email, she was cut off from Defendant and Ulrey and received no more emails, text messages, phone calls or other communication, despite having been in nearly continuous contact with them. (Am. Compl. ¶ 202.) Finally, Plaintiff argues that causation is supported by the proximity in time between the protected activity and her termination, only nine days. She alleges that she was not given any discipline prior

25

to termination and that she was discharged for her refusal to upcode. (Am. Compl. ¶¶ 203-205.) The Court need not reach these final elements, where Plaintiff's allegations do not show that she was engaged in a protected activity.

### E.   Whether Plaintiff Stated A Claim For Discharge In Violation Of Public Policy

Plaintiff's fifth and final count is for discharge in breach of public policy. Plaintiff argues that the Michigan Supreme Court recognizes three public policy exceptions to an employer's right to discharge an at-will employee. *See Suchodolski v. Michigan Consolidated Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982) ("[A]n exception has been recognized . . . , based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." " . . . . Such a cause of action has been found to be implied where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment."). Defendant points out that "[a] public policy claim is sustainable ... only where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue." *Dudewicz v. Norris–Schmid, Inc.*, 503 N.W.2d 645, 650 (Mich.1993), *disapproved of on other grounds by Brown v. Mayor of Detroit*, 734 N.W.2d 514 (Mich. 2007). The facts that give rise to Plaintiff's public policy claim are the same as those giving rise to her FCA claim, therefore, she cannot bring a claim for discharge in violation of public policy. The Court will grant Defendant's motion to dismiss as to Plaintiff's Count V.

## IV.  CONCLUSION

For the reasons set forth herein, the Court GRANTS Defendant's motion to dismiss (dkt. 21) and DISMISSES Plaintiff's Amended Complaint.

26

**SO ORDERED**.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  September 29, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 29, 2016, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager